UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

PAIGE DU BOIS,                                    Case No. 19-CV-1676 (PJS/LIB)

        Plaintiff,

v.                                                                ORDER

THE BOARD OF REGENTS OF THE
UNIVERSITY OF MINNESOTA,

        Defendant.

---

Beau D. McGraw, MCGRAW LAW FIRM, PA, for plaintiff.

Carrie Ryan Gallia, UNIVERSITY OF MINNESOTA OFFICE OF THE GENERAL
COUNSEL, for defendant.

Plaintiff Paige Du Bois was a cross-country runner and track-and-field athlete at

the University of Minnesota Duluth ("UMD").  In the spring of 2018, Du Bois's coach

(Joanna Warmington) took a leave of absence after being accused of sexual harassment.

UMD investigated the allegations, and Du Bois supported Warmington during the

investigation.  Shortly before the beginning of the 2018-2019 school year, UMD

announced that Warmington would not be returning as the women's cross-country and

track-and-field coach.  Disappointed with the news, Du Bois asked UMD for permission

to redshirt[1] during the fall cross-country season.  UMD refused, and Du Bois transferred

to another school.

Du Bois brought this lawsuit against UMD,[2] alleging that it engaged in unlawful

retaliation when it refused to allow her to redshirt.[3]  Du Bois also brings two sex-

discrimination claims.[4]  UMD now moves to dismiss all of Du Bois's claims.

---

[1]College athletes have only four years of athletic eligibility.  *See* NCAA Division I Manual § 12.8.  A college athlete who "redshirts" during a season remains on her team but does not compete, thus preserving a year of athletic eligibility.  *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 91 n.1 (2d Cir. 2012).  A college athlete may choose to redshirt for various reasons, such as "because of [an] injury" or because she simply wishes "to conserve a year's eligibility while practicing and improving skills."  *Id.* (citations omitted).

[2]Du Bois technically brings suit against The Board of Regents of the University of Minnesota, which is the governing body for UMD.

[3]After Du Bois filed this lawsuit, Warmington also sued UMD.  *See Warmington v. Bd. of Regents of Univ. of Minn.*, Case No. 19-CV-2767 (ECT/LIB).  Du Bois and Warmington are represented by the same attorney.

[4]Du Bois also brings a negligence claim against UMD.  *See* ECF No. 1 at ¶¶ 126-29.  But, as Du Bois conceded at the hearing on UMD's motion to dismiss, her negligence claim is barred by sovereign immunity.  *See, e.g., Treleven v. Univ. of Minn.*, 73 F.3d 816, 819 (8th Cir. 1996) (holding that the University of Minnesota is "an arm of the state and thus entitled to share in its Eleventh Amendment immunity"); *Does v. Regents of Univ. of Minn.*, No. 18-CV-1596 (DWF/HB), 2019 WL 2601801, at *10 (D. Minn. June 25, 2019) (holding that "the University is an instrumentality of the state and there is no evidence that [] the University has consented to be sued in federal court on breach of contract and negligence claims").

## I.  BACKGROUND

After a successful high-school athletic career, Du Bois was recruited to UMD by Warmington.  ECF No. 1 at ¶ 11.  Du Bois had competed for about a year and a half at UMD when, in March 2018 (the spring of Du Bois's sophomore year), Warmington unexpectedly took a leave of absence.  *Id.* at ¶¶ 12, 14, 17-18.  Du Bois and the rest of her teammates—who were about to begin the outdoor track-and-field season—were not told why their coach had suddenly gone on leave.  *Id.* at ¶¶ 14-15.  In the meantime, the team carried on without a coach.  *Id.* at ¶ 29.

Over the next couple of days, Du Bois attempted to discover the reason for Warmington's decision.  Du Bois met with various members of the UMD Athletic Department staff, but no one would tell her why Warmington had taken leave.  ECF No. 1 at ¶¶ 19-20, 23-24.  Assistant Athletic Director Karen Stromme did tell Du Bois that, if she wanted to preserve her athletic eligibility for when Warmington returned, she could redshirt during the spring track-and-field season.  *Id.* at ¶¶ 26-27.

About a week after the team was told that Warmington was taking a leave of absence, the team was informed that Warmington was being investigated for "the wellbeing of the team."  ECF No. 1 at ¶ 37.  Du Bois soon learned from teammates that the investigation was focused on allegations that Warmington had committed sexual harassment.  *Id.* at ¶¶ 42-44.  At a meeting with the team, Athletic Director Josh Berlo

said that team members might be required to talk to the investigator; Berlo also invited team members to contact the investigator if they wanted to provide information. *Id.* at ¶ 38. After the meeting, Berlo pulled Du Bois aside and privately told her that, if she was so inclined, she could go to the investigator and share information favorable to Warmington. *Id.* at ¶ 40. Du Bois later met with the investigator and advocated on Warmington's behalf, and Du Bois encouraged her teammates to do likewise. *Id.* at ¶ 117.

Du Bois decided to compete during the spring track-and-field season; in other words, she declined Stromme's offer to redshirt. ECF No. 1 at ¶ 28. The women's track-and-field team did not have a coach during the entire spring season. *Id.* at ¶ 29. The team was told that, if anyone needed help from a coach, she could speak with the men's track-and-field coach or the men's sprint-and-hurdler coach. *Id.* at ¶ 30.

Spring track-and-field season ended and summer began, and Warmington remained on leave. Throughout the summer, Du Bois met with UMD Athletic Department staff on at least nine different occasions "to discuss her future and the future of Coach Warmington." ECF No. 1 at ¶ 51. Du Bois was repeatedly assured that Warmington's return was a matter of "when," not "if." *Id.* at ¶ 52.

Throughout the summer, UMD entrusted Du Bois with a variety of tasks that normally would be performed by the head coach. ECF No. 1 at ¶ 56. These tasks

included collecting jerseys and equipment from the graduating team members; setting

up the team's locker room; assigning lockers; creating a laundry-assignment list;

ordering team apparel; drafting a training plan for training-camp week; collaborating

with the men's team on joint activities; contacting recruits; and helping set up a

strength-training program for the team.  *Id.* at ¶¶ 56-57, 59-60.

Late in the summer, Du Bois suffered an injury, and it was not clear whether she

would be ready for the start of the fall cross-country season.  ECF No. 1 at ¶ 62.  In light

of her injury, and given the uncertain status of Warmington, Du Bois contemplated

redshirting.  *Id.* at ¶¶ 62-63.  Du Bois does not plead that she discussed the possibility of

redshirting with anyone in the UMD Athletic Department at this point.  Du Bois does

plead, however, that an unidentified teammate "received information from the

Compliance Director indicating that an athlete could redshirt during the Fall season but

could still practice with the cross country team."  *Id.* at ¶ 63.

On August 20, 2018, the women's cross-country team began training-camp week.

ECF No. 1 at ¶ 67.  That same day, Athletic Director Berlo informed the team that

Warmington had resigned.  *Id.* at ¶¶ 67-68.  Berlo told the team that, because

Warmington's resignation had caught him by surprise, the team would be without a

coach for a while.  *Id.* at ¶ 69.  Du Bois (who had been communicating with

Warmington) confronted Berlo in front of the team, telling Berlo that he could not

possibly have been surprised by Warmington's resignation since he had demanded that

she resign and threatened her with termination if she did not do so.  *Id.* at ¶ 71.

(Du Bois had been told this by Warmington.  *Id.* at ¶ 66.)  Du Bois asked Berlo why he

was lying.  *Id.* at ¶ 71.  Berlo refused to comment further.  *Id.* at ¶ 72.

After learning that Warmington would not be returning, Du Bois inquired about

redshirting during the fall cross-country season.  ECF No. 1 at ¶ 73.  Du Bois was

informed by Assistant Athletic Director Abby Strong that redshirting was not an option.

*Id.* at ¶ 74.  Du Bois was confused, given that Assistant Athletic Director Stromme had

offered her the opportunity to redshirt in the spring, and given that a teammate of hers

(Emi Trost[5]) had been allowed to redshirt the prior year despite being medically cleared

to compete.  *Id.* at ¶¶ 74-75.  When Du Bois asked Strong why Trost was allowed to

redshirt and she was not, Strong told Du Bois that Trost was a national champion and

that Du Bois was not fully informed about Trost's medical condition.  *Id.* at ¶¶ 75-76.

Strong also told Du Bois that redshirting was not for "someone like her."  *Id.* at ¶ 78.

About the time that she was asking about redshirting, Du Bois also began

speaking to UMD Athletic Department staff "about the possibility of being allowed to

talk to other schools about joining their program."  ECF No. 1 at ¶ 80.  Du Bois was told

---

[5]Du Bois alleges that Trost's involvement in the Warmington investigation was
different from hers.  *See* ECF No. 1 at ¶¶ 76, 79.  The Court infers from this allegation
that Trost either was not involved at all in the Warmington investigation or was
involved but (unlike Du Bois) did not support Warmington.

that, in order to visit other schools, she would need to ask UMD for her release.  *Id.*
at ¶ 81.  She was also cautioned that, once she asked for her release, she would not be
allowed to use the team facilities or practice with the team.  *Id.*  That surprised Du Bois,
because she had been given a release during the spring season and visited other
schools, while also using team facilities and practicing with the team.  *Id.* at ¶¶ 81-82.
Du Bois's confusion was compounded by the fact that Trost also had been allowed to
take official meetings with other schools while still practicing with the team.  *Id.* at ¶ 82.

On August 27, 2018, Scott Keenan was appointed as the interim head coach of the
women's cross-country program.  ECF No. 1 at ¶ 84.  Two days later (August 29),
Du Bois met with Keenan, told him about her injury, and informed him that, according
to the trainer, she would not be able to compete in the season's first event (which was
scheduled for September 6).  *Id.* at ¶ 85.  Two days later (August 31), Keenan presented
Du Bois with two options:  She could be on the cross-country team in the fall of 2018
and compete (i.e., not redshirt), or she could leave the team.  Du Bois could not,
however, be on the team and not compete (i.e., redshirt).  *Id.* at ¶¶ 86-88.

On September 4, 2018, Du Bois was summoned to a meeting with UMD Athletic
Department staff.  ECF No. 1 at ¶ 89.  The staff told Du Bois that they had heard that she
intended to transfer to another school and that, in the meantime, she wanted to preserve
her athletic eligibility (i.e., she wanted to redshirt).  *Id.* at ¶ 92.  Du Bois informed the

Athletic Department staff—repeatedly—that she had not yet made up her mind about transferring. *Id.* at ¶ 95. Du Bois was told that she needed to make up her mind and that, until she made up her mind, she would be "segregated from the team." *Id.* at ¶¶ 96-97. Du Bois was directed to clear out her locker and stay away from the team, and she was given two days (until September 6) to decide whether she wanted to compete. *Id.*

Du Bois left the meeting with the Athletic Department and, later that day, filed a complaint with the University's Office of Equal Opportunity and Affirmative Action ("EOAA"). In the complaint, Du Bois alleged that UMD was retaliating against her for supporting Warmington during the sexual-harassment investigation. ECF No. 1 at ¶ 99. On September 8, Du Bois transferred to Northern Michigan University, where she immediately began competing on the women's cross-country team. *Id.* at ¶ 98.

Du Bois later filed this lawsuit against UMD. Du Bois alleges that UMD violated Title IX by (1) retaliating against her by not allowing her to redshirt because she supported Warmington during the sexual-harassment investigation, (2) discriminating against her and other female athletes by granting permission to redshirt to male athletes but not to female athletes, and (3) inadequately funding the women's cross-country and track-and-field teams. UMD has moved to dismiss Du Bois's claims. For the following

reasons, the Court grants UMD's motion and dismisses some of Du Bois's claims with prejudice and others without.

## II.  ANALYSIS

### A.  Standard of Review

In ruling on a motion to dismiss, a court must treat the facts pleaded in the complaint as true and construe those facts in the light most favorable to the plaintiff. *See DeVries v. Driesen*, 766 F.3d 922, 923 (8th Cir. 2014).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

A plaintiff alleging discrimination under Title IX need not establish a prima facie case to survive a motion to dismiss.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510-11 (2002) (plaintiff in a Title VII discrimination case is not required to plead a prima facie case of discrimination under *McDonnell Douglas* to survive a motion to dismiss, as that "is an evidentiary standard, not a pleading requirement"); *see also Brine v. Univ. of Iowa*, 90 F.3d 271, 276 (8th Cir. 1996) (applying Title VII standards in a Title IX discrimination case).  But to state a claim to relief that is plausible on its face, a plaintiff must plead facts that would establish the ultimate elements of her claim.  *See, e.g., Cicalese v. Univ. of*

*Tex. Med. Branch*, 924 F.3d 762, 766-67 (5th Cir. 2019); *McCleary-Evans v. Md. Dep't. of Transp.*, 780 F.3d 582, 585 (4th Cir. 2015).

Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, the motion must be treated as a motion for summary judgment. Fed. R. Civ. P. 12(d). But the court may consider materials that are necessarily embraced by the complaint without converting the motion into one for summary judgment. *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 n.4 (8th Cir. 2003). In this case, the Court will consider Du Bois's EOAA complaint, which is embraced by the complaint (*see* ECF No. 1 at ¶ 99), and whose authenticity is not disputed.

### B. Merits

Du Bois alleges that UMD violated Title IX in three different ways: first, by retaliating against her because she participated in a Title IX investigation[6]; second, by

---

[6]Du Bois alleges that she was retaliated against because of three different things that she did: (1) participate in the investigation into Warmington's alleged sexual harassment (specifically, provide the investigator with information that was favorable to Warmington), ECF No. 1 at ¶ 117(a); (2) encourage her teammates to provide favorable information about Warmington to the investigator, *id.* at ¶ 117(b); and (3) question the honesty of UMD Athletic Department administrators, *id.* at ¶ 117(c).

As discussed at the hearing, the Court will treat Du Bois's first and second activities—providing the investigator with information favorable to Warmington and encouraging teammates to do likewise—as one and the same. Both of these activities involve Du Bois participating in the Title IX investigation in support of Warmington. As Du Bois conceded at the hearing, the third activity—questioning the honesty of UMD Athletic Department administrators—is not protected under Title IX.

(continued...)

discriminating against female athletes by freely granting permission to redshirt to male

athletes but not to female athletes; and third, by inadequately funding the women's

cross-country and track-and-field teams.  The Court address Du Bois's claims in turn.

### 1.  Title IX Retaliation

The principal claim in Du Bois's lawsuit is that UMD unlawfully retaliated

against her by not allowing her to redshirt[7] after she participated in the Title IX

---

(...continued)
Accordingly, the Court does not address that claim.

[7]Du Bois alleges that UMD took three different retaliatory acts: (1) denying her
the opportunity to redshirt, (2) refusing to allow her to reallocate scholarship funds, and
(3) removing her from the team.  ECF No. 1 at ¶ 118.

As discussed at the hearing, UMD did not "remove" Du Bois from the team.
According to Du Bois's complaint, Du Bois was told that she could be on the cross-
country team in the fall and compete, or she could quit the team; what she could not do
was remain a member of the team but not compete.  This is analytically
indistinguishable from denying Du Bois permission to redshirt, which the Court
analyzes below.

As to the reallocation-of-scholarship-funds claim:  As the Court explained at the
hearing, this claim is insufficiently pleaded.  All that Du Bois's complaint says about
scholarship-fund reallocation is that "[t]he University deliberately and intentionally
subjected Plaintiff to adverse actions, including . . . refusing to allow Plaintiff to
reallocate her scholarship funds."  ECF No. 1 at ¶ 118.  This single conclusory sentence
does not contain enough information to plead a plausible retaliation claim.  To what
scholarship funds is the complaint referring?  When did Du Bois ask to "reallocate"
those funds?  To whom did she make the request?  What does it mean to "reallocate"
scholarship funds?  When was the request denied?  Who denied the request?  What
explanation (if any) was given for the denial?  It is impossible to determine from the
complaint whether "refusing to allow Plaintiff to reallocate her scholarship funds" was

(continued...)

-11-

investigation and provided information favorable to Warmington.  Title IX prohibits

recipients of federal education funding from engaging in discrimination "on the basis of

sex."  20 U.S.C. § 1681(a).  Unlike many federal and state civil-rights statutes, Title IX

does not explicitly address retaliation.  But in *Jackson v. Birmingham Board of Education*,

544 U.S. 167 (2005), the Supreme Court found that retaliation against a person who

complains about sex discrimination is itself a form of discrimination "on the basis of

sex," and thus is forbidden by Title IX.

       To state a claim for retaliation, a plaintiff must establish (1) that she engaged in

protected activity, (2) that the funding recipient took a materially adverse action against

her, and (3) that there was a but-for causal connection between her protected activity

and the materially adverse action.  *See* Eighth Circuit Model Civil Jury Instr. § 10.40; *see*

*also Brine*, 90 F.3d at 276 (applying Title VII's standards in a Title IX discrimination

case).[8]  Du Bois's retaliation claim must be dismissed because she fails to plausibly

_____

(...continued)
a materially adverse action and, if so, whether there was a causal connection between
that action and any protected activity.  The Court therefore dismisses this retaliation
claim.  (The Court notes that it is dismissing this claim with prejudice because, even if
Du Bois had plausibly pleaded that refusing to allow her to reallocate scholarship funds
was a materially adverse action, Du Bois has not plausibly pleaded that she engaged in
any protected activity (for reasons the Court explains below).)

       [8]*See also Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 857 (7th Cir. 2019) (requiring a
plaintiff at the pleading stage to plausibly plead that "(1) he engaged in protected
activity under Title IX, (2) [the university] took a materially adverse action against him,
(continued...)

plead two of these three elements.  First, Du Bois does not plausibly plead that she

engaged in protected activity.  Second, even if Du Bois had plausibly pleaded that she

engaged in protected activity, she does not plausibly plead a causal connection between

her protected activity and UMD's adverse action.

### a.  Protected Activity

Because the text of Title IX does not mention retaliation, the starting point for

identifying what conduct is protected from retaliation under Title IX is necessarily

*Jackson*.  In *Jackson*, a school board fired the coach of its high-school girls' basketball

team after the coach complained about unequal treatment.  *Jackson*, 544 U.S. at 171-72.

After the coach was fired, he brought suit against the school board alleging that it

"violated Title IX by retaliating against him for protesting the discrimination against the

girls' basketball team."  *Id.* at 172.  The Supreme Court held that the coach had a viable

claim because "[r]etaliation against a person because that person has complained of sex

discrimination is another form of intentional sex discrimination encompassed by

Title IX's private cause of action."  *Id.* at 173.  The Court reasoned that "[r]etaliation is,

by definition, an intentional act," and that "retaliation is discrimination 'on the basis of

_____

(...continued)
and (3) there was a but-for causal connection between the two" (citation omitted));
*Feminist Majority Found. v. Hurley*, 911 F.3d 674, 694 (4th Cir. 2018) (requiring plaintiffs
at the pleading stage to plausibly "allege that they engaged in protected activity under
Title IX" and "that—as a result of their protected activity—they suffered an adverse
action attributable to the defendant educational institution"  (citations omitted)).

sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." *Id.* at 173-74.

Although *Jackson*'s rationale is debatable,[9] it is also clear:  When a defendant retaliates against someone *because that person has complained of sex discrimination*, the defendant is discriminating "on the basis of sex."  Thus, the conduct that is protected from retaliation by Title IX (as interpreted by *Jackson*) is *opposition* to discrimination on the basis of sex.  The problem for Du Bois is that she never reported, complained about, or in any other way *opposed* sex discrimination.  To the contrary, Du Bois defended Warmington—a coach who had been accused of sex discrimination.  Instead of opposing a violation of Title IX, Du Bois was contending that no violation of Title IX had occurred.  Clearly, then, Du Bois did not engage in conduct that is protected from retaliation under *Jackson*—conduct that *Jackson* consistently and repeatedly describes as *opposition* to sex discrimination.  *See Jackson*, 544 U.S. at 171 (Title IX retaliation claim lies "where the funding recipient retaliates against an individual *because he has complained about sex discrimination*" (emphasis added)); *id.* at 173 ("Retaliation against a person

---

[9]The *Jackson* dissent argued that "[a] claim of retaliation is not a claim of discrimination on the basis of sex."  544 U.S. at 186 (Thomas, J., dissenting).  In the dissent's view, when the school board failed to afford equal treatment to the boys' and girls' basketball teams, it was discriminating against the girls on the basis of their sex.  But when the school board retaliated against the coach because he complained of this discrimination, the school board was not discriminating against the coach on the basis of *his* sex.  Sex motivated the former decision; it had nothing to do with the latter decision.

*because that person has complained of sex discrimination* is another form of intentional sex

discrimination encompassed by Title IX's private cause of action." (emphasis added));

*id.* at 174 ("[R]etaliation is discrimination 'on the basis of sex' because it is an intentional

response to the nature of the complaint: *an allegation of sex discrimination.*" (emphasis

added)); *id.* ("[W]hen a funding recipient retaliates against a person *because he complains*

*of sex discrimination*, this constitutes intentional 'discrimination' 'on the basis of sex,' in

violation of Title IX." (emphasis added)); *id.* at 178 ("[T]he text of Title IX prohibits a

funding recipient from retaliating against a person *who speaks out against sex*

*discrimination*, because such retaliation is intentional 'discrimination' 'on the basis of

sex.'" (emphasis added)); *id.* at 179 ("Where the retaliation occurs *because the complainant*

*speaks out about sex discrimination*, the 'on the basis of sex' requirement is satisfied."

(emphasis added)).

 Du Bois nevertheless argues that mere participation in a Title IX investigation

should be considered protected activity, even if that participation takes the form of

arguing that sex discrimination did not occur.  In support of her argument, Du Bois

relies not on Title IX, but on Title VII, which explicitly forbids retaliation, and which

explicitly protects not only those individuals who have "opposed any practice made an

unlawful employment practice by [Title VII]," but also those individuals who have

"made a charge, testified, assisted, or participated *in any manner* in an investigation,

proceeding, or hearing under [Title VII] . . . ." 42 U.S.C. § 2000e–3(a) (emphasis added).

The fact that Du Bois has to rely on Title VII in arguing that she has a cause of

action under Title IX highlights the problem with her argument:  Title VII and Title IX

are different statutes that use different language.  Title VII explicitly forbids retaliation

and extends that protection broadly.  Title IX does not say a word about retaliation.

Instead, Title IX forbids discrimination on the basis of sex, and *Jackson* holds that

retaliating against someone who has opposed discrimination on the basis of sex is itself

a form of discriminating on the basis of sex.  Even under *Jackson*'s capacious

interpretation of Title IX, retaliating against someone who has *not* opposed sex

discrimination—indeed, who has argued that no sex discrimination *occurred*—cannot

possibly be considered a form of discrimination on the basis of sex.  Because Du Bois

never reported, complained of, or otherwise opposed any practice made unlawful by

Title IX, the Court concludes that Du Bois did not engage in any activity protected

against retaliation by Title IX as interpreted by *Jackson*.[10]

_____

[10]*See Doe v. Belmont Univ.*, 367 F. Supp. 3d 732, 756-58 (M.D. Tenn. 2019)
(declining to extend *Jackson*'s retaliation cause of action to encompass the accused in a
Title IX investigation when the accused simply participated in the investigation by
defending himself and did not complain about sex discrimination); *but see Wilkerson v.
Univ. of N. Tex.*, 223 F. Supp. 3d 592, 602-03 (E.D. Tex. 2016) (reaching the opposite
conclusion and finding that an accused in a Title IX investigation who simply
participated in the investigation by defending himself and providing evidence in his
(continued...)

The Court's conclusion is bolstered by the fact that, unlike Title VII, Title IX was enacted as an exercise of Congress's powers under the Spending Clause. *Jackson*, 544 U.S. at 181. An entity that is subject to Title IX because it receives federal funds can be held liable for money damages only when it receives fair notice that its conduct violates Title IX.[11] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 287 (1998). Here, nothing in

---

[10](...continued)
favor was engaged in protected activity under Title IX).

The Court acknowledges that the Department of Education promulgated a regulation that essentially treats Title VII's broad retaliation provisions as though they apply under Title IX. Under this regulation, Du Bois engaged in protected activity when she participated in the investigation of Warmington. *See* 34 C.F.R. § 100.7(e) (incorporated by reference by 34 C.F.R. § 106.71). But the regulation is not enforceable via a private cause of action because (for reasons the Court has already explained) it prohibits conduct that is not prohibited by Title IX itself. *See Alexander v. Sandoval*, 532 U.S. 275 (2001) (holding that Title VI regulations—which prohibited conduct that Title VI itself allowed—were not enforceable via a private cause of action); *see also Jackson*, 544 U.S. at 178 & n.2 (explaining that, consistent with *Sandoval* and other Supreme Court precedent, "plaintiffs may not assert claims under Title IX for conduct not prohibited by that statute").

[11]The logic of this is simple. A law that relies on Congress's spending power essentially offers a deal to potential recipients: The government will give money to the recipient, and, in return, the recipient will agree to certain conditions. In order for such an agreement between the government and recipient to be knowing and voluntary, the recipient must have fair notice of what obligations and liabilities it is assuming. *See, e.g.*, *Barnes v. Gorman*, 536 U.S. 181, 185-89 (2002) (concluding that punitive damages were not available under spending-clause legislation and noting that "'[w]ithout doubt, the scope of potential damages liability is one of the most significant factors a school would consider in deciding whether to receive federal funds,'" and "it is doubtful whether they would even have *accepted the funding* if punitive damages liability was a required condition" (citation omitted)).

the language of Title IX—which, as noted, does not even mention retaliation—can be said to have given UMD fair notice that retaliating against Du Bois for supporting someone accused of violating Title IX would violate the statute.  Indeed, nothing in *Jackson*—which equates retaliation against someone who *opposes* sex discrimination with sex discrimination—put UMD on notice that retaliating against someone who does *not* oppose sex discrimination would violate Title IX.

For these reasons, the Court holds that Du Bois has not pleaded that she engaged in activity that is protected from retaliation under Title IX, and thus her retaliation claim against UMD must be dismissed.

*b.  Causal Connection*

Even if Du Bois engaged in "protected activity" when she advocated for the accused during a Title IX investigation, her retaliation claim suffers another flaw: Du Bois has not pleaded a plausible causal connection between that "protected activity" and UMD's allegedly retaliatory action.

Du Bois participated in the Title IX investigation in April 2018.[12]  UMD denied Du Bois's request to redshirt in late August 2018, over four months later.  Because several months passed between Du Bois's (alleged) protected activity and UMD's

_____

[12]Du Bois's complaint implies—but does not actually say—that she spoke to the investigator (and encouraged her teammates to do likewise) in April 2018.  Du Bois confirmed at the hearing that she engaged in these activities in April 2018.

-18-

(alleged) retaliatory action, Du Bois cannot rely on temporal proximity to establish a causal connection.  Instead, she must plead alternative facts that link her protected activity to UMD's adverse action.  *See, e.g., Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 986 (8th Cir. 2011) ("As more time passes between the protected conduct and the retaliatory act, the inference of retaliation becomes weaker and requires stronger alternative evidence of causation.  The inference vanishes altogether when the time gap between the protected activity and the adverse employment action is measured in months." (internal citations omitted)).

Du Bois's complaint identifies no such alternative evidence of causation, save for a single vague statement made in August 2018 by Assistant Athletic Director Strong.  Specifically, Strong told Du Bois that she could not redshirt during the fall cross-country season because redshirting was not for "someone like her."  ECF No. 1 at ¶ 78.  It is not clear what Strong meant by "someone like her," but it is not plausible to interpret this statement as alluding to Du Bois's participation in the Title IX investigation for several reasons:

First, more than four months had passed between Du Bois's participation in the investigation and Strong's statement.  Second, during those intervening months, UMD gave Du Bois coach-like levels of responsibility—asking her to handle team logistics,

draft training plans, and even contact recruits.  ECF No. 1 at ¶¶ 56-57, 59-60.[13]  And

third, just a week before Du Bois's request to redshirt was denied, she had learned that

Warmington would not be returning, become angry with UMD administrators for

forcing Warmington to resign, and called the Athletic Director a liar in front of the

entire team.  Under the circumstances, Strong's statement to Du Bois that redshirting

was not for "someone like her" cannot plausibly be interpreted as a reference to

Du Bois's participation in the Title IX investigation.  Likewise, UMD's decision in

August 2018 to deny Du Bois's request to redshirt cannot plausibly be connected to her

participation in the investigation in April 2018.[14]

---

[13]Some of the responsibilities that UMD entrusted to Du Bois could arguably be characterized as more of a burden than a reward, but Du Bois has never suggested that the assignment of those responsibilities was an adverse action.  Moreover, other responsibilities entrusted to Du Bois (*e.g.*, contacting recruits and drafting training plans) were clearly privileges, and by giving those privileges to Du Bois, UMD was assigning her a leadership position on her team.

[14]In the complaint that Du Bois filed with UMD's EOAA office, she accused UMD of retaliating against her by denying her a leadership position on the NCAA Student-Athlete Advisory Committee.  ECF No. 15 at 4.  In the complaint that Du Bois filed with the Court, however, Du Bois mentions this incident only briefly, explaining that at some point in the spring of 2018 Assistant Athletic Director Stromme asked her if she had any interest in being the President of the Student-Athlete Advisory Committee.  ECF No. 1 at ¶ 45.  According to the complaint, Du Bois told Stromme that she was interested in the position, but that she would not be able to attend the first meeting.  *Id.* at ¶ 47.  After the investigation into Warmington was announced, however, Du Bois heard nothing more about the committee.  *Id.* at ¶ 48.  When Du Bois asked Stromme about it, Stromme told her that the committee did not have a "President" and that UMD had concluded that Du Bois was not interested in the committee given that she did not

(continued...)

At oral argument, Du Bois's attorney tried to manufacture a temporal connection between Du Bois's participation in the Title IX investigation in April and the denial of her request to redshirt in August. His argument was essentially as follows: In April, when Du Bois participated in the investigation, UMD had not yet decided what to do about Warmington. UMD did not decide that Warmington had to go until August. Thus, it was not until August that it became clear to UMD that the position that Du Bois had taken back in April (Warmington should stay) was contrary to UMD's position (Warmington should go).

---

[14](...continued)
attend any of its meetings. *Id.* at ¶ 49. Stromme claimed that she had notified Du Bois about these meetings via email, but Du Bois never received any such messages, and Du Bois has messages from Stromme in which Stromme claims that she "inadvertently" left Du Bois off the email list. *Id.* at ¶¶ 49-50.

Du Bois has not alleged that this conduct constituted a materially adverse action that could give rise to a retaliation claim, and her complaint does not plead sufficient facts to permit the Court to make that inference. Du Bois's complaint does not explain the responsibilities of the Student-Athlete Advisory Committee, who typically serves on the committee, who appoints members to the committee, how the committee is led, how its leaders are chosen, or anything else of relevance.

Moreover, Du Bois participated in the Title IX investigation in April 2018 after being *encouraged* by Berlo to do so—and shortly before UMD gave her a leadership role with the women's cross-country team. As described below, Du Bois's theory is that UMD did not turn on her until late August 2018 because UMD did not decide until then that Warmington would have to resign. Under Du Bois's own theory, then, the failure to appoint Du Bois to the committee in the spring or summer of 2018 could not have been in retaliation for her participation in the Title IX investigation.

This is an implausible argument.  The tenor of Du Bois's complaint is that, from the beginning, she was waging a lonely battle in support of Warmington.  Du Bois's complaint implies that multiple teammates lodged or supported complaints against Warmington, but the complaint gives no hint that anyone except Du Bois supported Warmington.  Thus, the fact that Du Bois was providing a "counter-narrative"—i.e., that she was alone (or almost alone) in standing up for Warmington—was known to UMD from the beginning.  UMD nevertheless treated Du Bois favorably until late August.

Moreover, Du Bois alleges that Athletic Director Berlo "privately" told her in April "that she could go to the investigator with information favorable to Warmington," but that "the rest of the team" was never told this.  ECF No. 1 at ¶¶ 40-41.  It is not plausible that UMD took action against Du Bois in August because back in April she had *accepted Berlo's invitation* to support Warmington.  What is plausible is that UMD took action against Du Bois in August because *in August* she fell out with the Athletic Department over Warmington's forced resignation and embarrassed the Athletic Director by accusing him of lying in front of the entire women's cross-country team.

In sum, Du Bois has not plausibly pleaded that she engaged in protected activity, and Du Bois has not plausibly pleaded a causal connection between her participation in the Title IX investigation in April 2018 and UMD's refusal to allow her to redshirt in

August 2018.  For these reasons, the Court grants UMD's motion to dismiss Du Bois's

Title IX retaliation claim.

## 2.  Redshirt Discrimination

Du Bois also claims that UMD discriminates "on the basis of sex" in violation of

Title IX by freely granting permission to redshirt to male athletes but not to female

athletes.  All that Du Bois pleads in support of her redshirt-discrimination claim is the

following:

- Sometime in the spring of 2018, Assistant Athletic Director Stromme offered Du Bois (a woman) the opportunity to redshirt during the spring track-and-field season.  ECF No. 1 at  ¶¶ 26-27.

- A teammate of Du Bois's, Emi Trost (a woman), was allowed to redshirt despite being "medically cleared to compete by the UMD training staff." *Id.* at ¶ 75.

- An unnamed teammate of Du Bois (a woman) was informed by the Compliance Director that an athlete could redshirt during the fall cross-country season and still practice with the team.  *Id.* at ¶ 63.

- In late August 2018, Assistant Athletic Director Strong told Du Bois that she would not be allowed to redshirt during the fall cross-country season because redshirting was not for "someone like her."  *Id.* at ¶¶ 73-74, 78.

- A "majority of the members of the football team and men's hockey team redshirt during their time at UMD."  *Id.* at ¶ 79.

These facts are not sufficient to make plausible Du Bois's allegation that UMD bases its decisions about whom may redshirt on the athlete's sex.  Du Bois pleads that at least three different athletes on the *women's* cross-country and track-and-field teams were told that they *could* redshirt—Du Bois (in the spring of 2018), Trost, and an unnamed teammate.  At the same time, Du Bois does not plead that UMD *ever* denied the request of a female athlete to redshirt, with one exception:  Du Bois herself was denied such permission in the fall of 2018.[15]

Du Bois does plead that a "majority of the members of the football team and men's hockey team redshirt during their time at UMD."  But Du Bois says nothing about how many athletes—male or female—*ask* to redshirt.  In other words, although Du Bois alleges that UMD discriminates against women in the way that it handles requests to redshirt, her complaint does not actually say anything about the way that UMD handles requests to redshirt.  For example, the complaint does not plead how many members of the men's cross-country and track-and-field teams asked to redshirt

---

[15]Strong's statement to Du Bois that redshirting was not for "someone like her" could not have been a reference to Du Bois's sex.  ECF No. 1 at ¶ 78.  That statement was made in response to Du Bois's complaint that another female athlete (Trost) was allowed to redshirt when Du Bois was not.  *See id.* at ¶¶ 73-78.  Strong was distinguishing Du Bois from Trost, and she obviously was not doing so on the basis of sex.

or how many of those requests were granted—much less plead the comparable numbers for members of the women's cross-country and track-and-field teams.

For these reasons, Du Bois's complaint fails to plead a plausible redshirt-discrimination claim.

### 3.  Funding Discrimination

Finally, Du Bois claims that UMD violated Title IX by failing to provide necessary funds and equipment to the women's cross-country and track-and-field teams.  Title IX "not only requires schools to establish athletic programs for female athletes, but also prohibits schools from discriminating against females participating in those programs by denying equivalence in benefits . . . ."  *Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 916 (7th Cir. 2012).

Claims alleging that men's and women's teams are not receiving equivalent benefits are known as "equal-treatment claims."  *Id.*  When analyzing equal-treatment claims, courts generally compare how men's and women's teams are treated with respect to the equipment and supplies provided to them, the scheduling of their game and practice times, the travel accommodations and per diem allowances that they receive, the coaching and tutoring opportunities available to them, the compensation of their coaches and tutors, the publicity that they receive, and the quality of various facilities that they use—including, for example, their locker rooms, practice facilities,

training and medical facilities, and housing and dining facilities.  *See* 34 C.F.R.

§ 106.41(c)(2)-(10).  "[F]ailure to provide necessary funds for teams for one sex" is a

factor for the Court to consider, but unequal expenditures do not, in and of themselves,

violate Title IX.  *See* 34 C.F.R. § 106.41(c).

Du Bois's complaint does not plead facts relevant to any of these factors.  Indeed,

although Du Bois's complaint alleges that UMD "fail[ed] to provide the necessary

funding and equipment for the [women's cross-country and track-and-field] team[s] as

compared to male sports," ECF No. 1 at ¶¶ 123-24, the complaint does not plead a

single fact in support of that allegation.  Therefore, Du Bois's equal-treatment claim

must be dismissed.[16]

---

[16]The Court briefly notes two other problems with Du Bois's equal-treatment
claim:

First, to the extent that Du Bois seeks damages, she has not pleaded that UMD
had notice of its alleged unequal treatment of the men's and women's teams.  *Grandson
v. Univ. of Minn.*, 272 F.3d 568, 575 (8th Cir. 2001) (indicating that a plaintiff seeking
damages on an unequal-treatment theory would need to meet *Gebser*'s notice
requirement).  Du Bois's EOAA complaint says nothing about inadequate funding, and
Du Bois's complaint does suggest any other way in which UMD might have received
notice.

Second, to the extent that Du Bois seeks injunctive relief, she would have
difficulty establishing standing.  Du Bois no longer attends UMD, and she does not
plead that she has any interest in transferring back to UMD.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein,

IT IS HEREBY ORDERED THAT:

1.    Defendant's motion to dismiss [ECF No. 7] is GRANTED.

2.    Count I of the complaint is DISMISSED WITH PREJUDICE AND ON THE

MERITS.

3.    Counts II and III of the complaint are DISMISSED WITHOUT

PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated:  February 14, 2020                    s/Patrick J. Schiltz_____
                                             Patrick J. Schiltz
                                             United States District Judge